IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CT-3065-H

DEONTRE MARKEE TAYLOR,                    )
                                          )
        Plaintiff,                        )
                                          )
                                          )
                                          )
        v.                                )
                                          )
                                          )     **ORDER**
                                          )
CRAIG   FRIEDMAN,    OFFICER              )
AMBROSE, OFFICER DANA ELLIS,              )
and OFFICER PILLMON, all in               )
their official and personal              )
capacities,                               )
                                          )
        Defendants.                       )


        This matter is before the court on the following motions:

        1.   defendants' motion for summary judgment [D.E. #34];

        2.   plaintiff's motion to amend his complaint [D.E. #19];

        3.   plaintiff's motion for leave to file his amended

complaint [D.E. #20];

        4.   plaintiff's motion for leave to file in forma pauperis

[D.E. #21];

        5.   plaintiff's motion to appoint counsel [D.E. #22]; and

        6.   plaintiff's request for subpoena evidence [D.E. #23].

The plaintiff has filed a response to defendants' motion for summary judgment, and these matters are ripe for adjudication.

## STATEMENT OF THE CASE

Plaintiff, appearing pro se, filed his complaint on March 3, 2014, alleging harms committed by defendants, Bertie-Martin Regional Jail, Craig Friedman, Officer Ambrose, Officer Dana Ellis, and Officer Pillmon, in violation of 42 U.S.C. § 1983. [D.E. #1].

On April 10, 2014, this court entered an order directing the clerk to continue management of this case after conducting a frivolity review but dismissed Bertie-Martin Regional Jail as an improperly named defendant. [D.E. #6]. Defendants filed an answer on May 27, 2014 denying the claims contained in plaintiff's complaint and asserting several affirmative defenses. [D.E. #12]. Plaintiff then filed the various motions detailed above on June 23, 2014. Due to plaintiff's failure to sign some of these motions, this court issued an order directing plaintiff to correct the deficiency [D.E. #25], and plaintiff timely complied. [D.E. ##29-32].

Defendants filed an answer to plaintiff's amended complaint on July 2, 2014 [D.E. #33] and served timely responses to plaintiff's "Request for Subpoena Evidence." Defendants then filed their motion for summary judgment on July 29, 2014 [D.E.

2

#34], which is now before the court. Plaintiff filed his response to defendants' motion for summary judgment on August 25, 2014. [D.E. #39].

## STATEMENT OF FACTS

Plaintiff is a young adult male who is over six feet tall and weighs approximately 190 pounds. [Pltf.'s dep. at pp. 8, 53]. He has a long criminal history beginning in 2007 when he was fifteen years old, and has been involved in multiple violent altercations inside and outside of confinement. [Pltf.'s dep. at pp. 19-24, 43]. According to plaintiff, he was diagnosed at age 12 or 13 with ADHD, bi-polar disorder, and schizophrenia. [Pltf.'s dep. at pp. 10, 12]. However, he states that he has not received any treatment or medication for these purported conditions since 2011 or 2012, following the retirement of his therapist. [Pltf.'s dep. at pp. 14-15].

As a consequence of his purported mental health diagnoses, plaintiff has a history of exhibiting irregular endangering conduct. For example, while being housed at the Western Youth Institute in 2010, plaintiff states he tied a bed sheet around his neck. [Pltf.'s dep. at p. 30]. In another example, while plaintiff was detained at Bertie-Martin Regional Jail in 2010, he states he intentionally stopped up the drain in the shower of his cell and then turned on the shower with the purported intent to cause the water to overflow deep enough for him to drown

3

himself. Detention officers, however, responded to the situation before he could incur harm. [Pltf.'s dep. at pp. 34-38]. Plaintiff states that Bertie-Martin Regional Jail officials placed him on suicide watch for about two weeks following this incident. [Pltf.'s dep. at p. 37].

Three years after the 2010 shower incident at Bertie-Martin Regional Jail, plaintiff did not demonstrate any mental confusion or behavior that would indicate he was a suicide risk when he was being in-processed at Bertie-Martin Regional Jail on May 4, 2013. [Pltf.'s dep. at Ex. 2]. Plaintiff likewise did not demonstrate any behavior to indicate he was a suicide risk when he was in-processed later the same year on consecutive days, December 21 and 22, 2013, immediately before the alleged harm occurred in the instant case. [Pltf.'s dep. at Exs. 2, 3]. Plaintiff admits he did not harbor any thoughts of harming himself until the morning of December 24, 2013. [Pltf.'s dep. at p. 53].

On the morning of December 24, 2013, Officer Pillmon was proceeding door to door down the hallway of plaintiff's cell block, passing out disposable razors to each prisoner for them to use to shave.[1] [Pltf.'s dep. at p. 57; Pillmon Aff., at ¶3]. Officer Pillmon asked plaintiff if he wanted a razor, and

---

[1] 10A NCAC 14J .0703 provides that "[e]ach inmate detained over 24 hours shall be provided with individual shaving supplies, except when security considerations dictate otherwise, and inmates shall not be allowed to share razors."

plaintiff answered, "yes." Consequently, Officer Pillmon left a disposable razor on the trap for plaintiff's use and continued down the hallway. [Pltf.'s dep. at pp. 57, 60; Pillmon Aff., at ¶3].

As of December 24, 2013, plaintiff was not on a suicide watch and had not expressed any thoughts or given any indication of any intent to harm himself. [Pltf.'s dep. at pp. 53, 120]. Before December 24, 2013, plaintiff had never tried to cut himself with a razor blade. [Pltf.'s dep. at pp. 56-57, 59]. Officer Pillmon did not know or have any reason to believe that plaintiff might harm himself with the disposable razor. [Pillmon Aff., at ¶3].

Plaintiff states he overheard Officer Pillmon tell the prisoner in the neighboring cell he hoped plaintiff "would cut more than his hair." [Pltf.'s dep. at p. 62]. While feeling homesick because it was Christmas Eve, plaintiff decided to cut himself with the disposable razor. He disassembled the razor, removed the razor blade, and cut himself four times on the outside of his right forearm – carefully avoiding cutting his wrist and stopping when the wounds bled more than he expected. [Pltf.'s dep. at pp. 57-66].

When Officer Pillmon returned to retrieve the disposable razors from the prisoners, he discovered that plaintiff had cut his arm. [Pltf.'s dep. at pp. 70-71; Pillmon Aff., at ¶4].

5

Officer Pillmon immediately informed his superiors about the incident, and another officer cleaned plaintiff's wounds before taking him to see the nurse. [Pltf.'s dep. at pp. 71-72; Pillmon Aff., at ¶5; Wesson Aff., at ¶¶3-4]. After the nurse cleaned and dressed plaintiff's wounds, she directed that he be taken to the hospital for further treatment. [Pltf.'s dep. at pp. 71-72; Pillmon Aff., at ¶5; Wesson Aff., at ¶4 ]. While at the hospital, medical staff inserted staples to close plaintiff's wounds. Plaintiff was then returned to Bertie-Martin Regional Jail less than ninety minutes later. [Pltf.'s dep. at pp. 72-73; Pillmon Aff., at ¶5; Wesson Aff., at ¶4]. Upon return to the jail, plaintiff was immediately placed on a suicide watch in a holding cell located directly across from the booking desk, where he could be observed on a continuous basis. [Pltf.'s dep. at pp. 73-74; Pillmon Aff., at ¶6; Wesson Aff., at ¶5].

On December 31, 2013, plaintiff admits he got into a loud argument with Officer Ambrose in response to receiving an instruction to be quiet. [Pltf.'s dep. at pp. 76-78]. Plaintiff told Officer Ambrose that he had the freedom to say whatever he wanted. [Pltf.'s dep. at pp. 76-78]. During this argument, plaintiff claims Officer Ambrose told him that he was a "waste of life" and that his father "should have nutted [sic] on the

6

side of a tree."[2] [Pltf.'s dep. at pp. 74-75]. In response, plaintiff told Officer Ambrose, "shut up and leave [me] alone." [Pltf.'s dep. at p. 78].

Later on the same day, plaintiff began removing the staples from his arm. [Pltf.'s dep. at pp. 81-82]. Plaintiff admits he wanted to go home and get outside of the jail, which was a motivating factor in his decision to remove the staples. [Pltf.'s dep. at pp. 81-82]. After removing the staples, plaintiff notified a sergeant about what he had done. [Pltf.'s dep. at p. 80; Bess Aff., at ¶6]. Again, the nurse was immediately notified, and plaintiff was transported to the hospital. [Pltf.'s dep. at pp. 83-84; Bess Aff., at ¶7]. Before leaving for the hospital, plaintiff loudly announced he was "getting to go on a trip outside." [Ambrose Aff., at ¶6; Bess Aff., at ¶7]. Plaintiff's wounds were re-bandaged, and he was returned to the jail just over one hour later. [Bess Aff., at ¶7]. After returning to the jail, plaintiff was told medical staff recommended transfer to Central Prison in Raleigh, North Carolina for safekeeping should he engage in further acts of self-destructive behavior. Wishing to avoid a transfer to Central Prison, plaintiff did not engage in any further acts of

---

[2] Although Officer Ambrose denies making this statement or any similar statement, the court will accept this fact as true due to its construction of facts in the light most favorable to the plaintiff for the purpose of ruling on defendants' motion for summary judgment.

self-harm. [Pltf.'s dep. at pp. 84-85, 121; Watson Aff., at ¶¶5-6, Exs. A, C].

By January 22, 2014, plaintiff had been returned to his administrative segregation cell, having been released from his suicide watch. [Pltf.'s dep. at pp. 91, 120-21]. At approximately 6:00 a.m. on that day, he was located inside his cell. The cell door was closed and locked, but the food tray slot, or trap, was open. Plaintiff claims he got into an argument with Officer Ellis over the food he was served for breakfast. [Pltf.'s dep. at pp. 90-91]. About this same time, plaintiff claims Officer Ellis began to beat his left hand, which he had placed in the trap, with a probing device. The probing device was approximately six inches long, one inch in diameter, and comprised of plastic. [Pltf.'s dep. at pp. 92-94]. Plaintiff states he "caught the drift" and pulled his hand back inside of his cell and Officer Ellis then closed the trap. [Pltf.'s dep. at pp. 95-98]. Plaintiff admits he was not injured from this incident.[3] [Pltf.'s dep. at p. 96].

Lastly, later on January 22, 2014, Officer Ambrose was conducting cell cleaning in plaintiff's cell block, proceeding cell by cell and distributing cleaning supplies and tools for

---

[3] Although Officer Ellis disputes plaintiff's contentions regarding this situation and states that plaintiff grabbed him before he exercised use of the probing device, this court will accept plaintiff's assertions as true due to its construction of facts in the light most favorable to the plaintiff for the purpose of ruling on defendants' motion for summary judgment.

8

each prisoner to use. During distribution of cleaning supplies, prisoners are required to remain inside their cells. [Pltf.'s dep. at p. 102; Ambrose Aff., at ¶7].

When Officer Ambrose opened plaintiff's cell door, plaintiff exited his cell and entered the hallway in violation of facility rules. [Pltf.'s dep. at p. 102; Ambrose Aff., at ¶8; Ellis Aff. At ¶4]. Officer Ambrose commanded plaintiff to return to his cell, but plaintiff did not comply. [Ambrose Aff., at ¶8; Ellis Aff., at ¶4]. Officer Ambrose then attempted to escort plaintiff back into his cell using a "soft-arm" escort position. [Pltf.'s dep. at p. 99; Ambrose Aff., at ¶8; Ellis Aff., at ¶4].

Plaintiff claims Officer Ambrose tried to punch him and then pushed him back into his cell. [Pltf.'s dep. at p. 99]. Plaintiff states he returned punches while Officer Ambrose kept "swinging at [him]." [Pltf.'s dep. at pp. 99-100]. Then, Officer Ellis arrived to assist Officer Ambrose after the fight erupted. [Pltf.'s dep. at p. 103]. Plaintiff states Officer Ambrose attempted to use pepper spray to subdue him, but plaintiff grabbed the pepper spray canister and disabled it by breaking the nozzle. [Pltf.'s dep. at pp. 100, 103-04]. Plaintiff admits he was not affected by any pepper spray. [Pltf.'s dep. at p. 104]. According to plaintiff, both Officer Ambrose and Officer Ellis tried to handcuff him but were unable to overcome his resistance; however, plaintiff states the officers succeeded in

9

securing one wrist in the handcuffs. [Pltf.'s dep. at pp. 104-06].

After breaking away from the officers, plaintiff rushed outside of his cell into the hallway leaving the officers in his cell. [Pltf.'s dep. at pp. 105-07]. Upon exit from his cell, plaintiff saw Corporal Leslie Bess who instructed him to return to his cell. Plaintiff complied with Corporal Bess' instruction. [Pltf.'s dep. at p. 109]. Plaintiff states Corporal Bess then instructed Officers Ambrose and Ellis to "just come out and shut the door" and that "[plaintiff] can't get to you through steel doors." [Pltf.'s dep. at p. 109]. Plaintiff returned to his cell, and Officers Ambrose and Ellis exited without further incident. [Pltf.'s dep. at pp. 109-10]. Plaintiff later put his hand outside the door through the food tray slot in his cell door so that officers could remove the handcuffs secured to one of his wrists. [Pltf.'s dep. at p. 110].[4]

After these events, plaintiff saw the nurse and claims he suffered bruises to his face, arm, and back in addition to a "blood clot"[5] in the white of his eye for which the nurse gave him some antibiotic eye drops. The bruises and "blood clot" in his eye completely healed within a few days. [Pltf.'s dep. at pp. 108, 110-11, 114]. Plaintiff admits he had no further

---

[4] Again, defendants dispute much of plaintiff's version of these events, but this court accepts the plaintiff's version as true for the purpose of ruling on defendants' motion for summary judgment.
[5] Plaintiff appears to be describing a blood vessel that burst.

10

incidents with Officers Ambrose and Ellis. [Pltf.'s dep. at pp. 114, 116].

During the course of each of the foregoing events alleged by plaintiff, defendant Craig Friedman, the Administrator of the Bertie-Martin Regional Jail, was not present at the jail and did not have any involvement in the alleged events. Plaintiff admits he has sued Mr. Friedman on the theory of vicarious liability. [Pltf.'s dep. at pp. 118-19].

## COURT'S DISCUSSION

### I. Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

11

Summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F.Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. The evidence must also be such that a reasonable jury could return a verdict for the non-moving party. Id. at 248. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F.Supp. at 125.

## II. **Analysis**

### A. Distribution of Razor to Plaintiff

Prison officials have a duty to protect prisoners from self-destruction or self-injury. Lee v. Downs, 641 F.2d 1117, 1121 (4th Cir. 1981). To establish a violation of the Eighth Amendment by prison officials resulting in a prisoner's self-inflicted injury, the prisoner must prove: (1) he suffered an objectively serious harm presenting a substantial risk to his

12

health or safety; and (2) such harm was caused by the deliberate indifference to the health or safety of the prisoner by defendants. See Farmer v. Brennan, 511 U.S. 825, 832-34 (1994); Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006).

The United States Court of Appeals for the Fourth Circuit has applied the standard of "deliberate indifference" to serious psychological conditions of prisoners. Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (citations omitted). Suicide is a serious harm. Collins, 462 F.3d at 760. The key inquiry when determining whether a prison official exercised deliberate indifference to the health or safety of a prisoner who suffers from suicidal tendencies is whether the defendants "knew, or reasonably should have known, of the [prisoner's] suicidal tendencies." William v. Haigwood, No. 5:08-CT-3138-BO, 2013 WL 1327144, at *10 (E.D.N.C. March 29, 2013) (citing Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir. 1991)). To prove deliberate indifference, the prisoner must show that the defendant both: (1) subjectively knew the prisoner was at a substantial risk of [attempting] suicide; and (2) intentionally disregarded the risk." Collins, 462 F.3d at 761.

Officer Pillmon did not violate the Eighth Amendment when he distributed a razor to the plaintiff who subsequently caused injury to himself by cutting the outside of his arm. The evidence does not support a conclusion that Officer Pillmon

13

actually knew of, and then intentionally disregarded, an objectively serious risk that plaintiff would harm himself with the disposable razor. Plaintiff was not on suicide watch and did not exhibit any suicidal ideations before Officer Pillmon distributed the razor to him in accordance with North Carolina law. Plaintiff admits he did not entertain any thoughts of cutting himself with the disposable razor until after he had received it. Plaintiff further admits he had never cut himself with a razor or harmed himself in any similar manner in the past. The significant lapse in time between plaintiff's last purported suicide attempt in 2010 and his conduct in December 2013 attenuates any hint that Officer Pillmon had reason to know of plaintiff's alleged suicidal tendencies - much less acted in intentional disregard of such a risk.

Therefore, even if plaintiff's injuries constitute an objectively serious harm, such injuries were not a consequence of deliberate indifference by Officer Pillmon in violation of his constitutional rights or a deprivation under 42 U.S.C. § 1983.

B. Plaintiff's Removal of Staples

Plaintiff does not present sufficient evidence to warrant a conclusion from a reasonable jury that his constitutional rights were violated when Officer Ambrose allegedly said to him, "you are a waste of life... your dad should have nutted [sic] on the

14

side of a tree." See, e.g., Johnson v. Laham, 374 Fed.Appx. 366 (4th Cir. 1993) ("Verbal harassment or abuse by prison officials in itself does not state a constitutional deprivation under section 1983."); Morrison v. Martin, 755 F.Supp. 683, 687 (E.D.N.C. 1990) (finding that subjection of prisoner to verbal abuse does not rise to level of constitutional deprivations cognizable in a civil rights action). Inasmuch as plaintiff claims a connection between Officer Ambrose's comment and his removal of staples from his arm later the same day, such a claim is unconvincing. Plaintiff admits he removed the staples from his arm later the same day because, at least in part, he wanted to go home and get outside of the jail. Plaintiff's proud declaration before departing the jail for the hospital supports his admission and significantly attenuates any purported connection between Officer Ambrose's comment and plaintiff's self-inflicted injury.

Therefore, even if plaintiff's allegation regarding Officer Ambrose's comment is true, this single episode of an inappropriate verbal comment by a prison official does not rise to a constitutional violation or deprivation under 42 U.S.C. § 1983.

## C. Plaintiff's Excessive Force Claims

The Cruel and Unusual Punishments Clause of the Eighth Amendment protects prisoners against excessive physical force

15

exercised by prison officials. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); See U.S. Const. amend. VIII. The key judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam)).

More specifically, the Supreme Court identified the following factors to consider when determining whether a prison official's action was carried out "maliciously and sadistically" to cause harm: (1) the need for application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321. In considering these factors, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 322.

Assuming plaintiff's version of the facts are true regarding the morning of January 22, 2014, even if Officer Ellis

was not grabbed by plaintiff before using a probe to strike plaintiff's knuckles in an effort to get plaintiff to remove his hands from the trap in his cell door, such application of force does not rise to the level of a constitutional violation. As held by the Supreme Court in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. "De minimis uses of physical force, provided that the use of force is not repugnant to the conscience of mankind," cannot be considered a constitutional violation. Id. Although Officer Ellis' touch may have been unwelcomed by plaintiff, it was a de minimis use of force to get plaintiff to remove his hand so that Officer Ellis could close the trap and not so repugnant as to warrant a constitutional violation.

Again, assuming plaintiff's version of the facts is true regarding a second incident on January 22, 2014, Officers Ambrose and Ellis' application of force against plaintiff does not rise to the level of a constitutional violation. Plaintiff admits he exited his cell in violation of the rules and further admits he disobeyed Officer Ambrose's command to return to it. In the ensuing struggle between plaintiff and Officer Ambrose and Officer Ellis who came to assist, plaintiff suffered minor injuries such as bruising and a "blood clot" which fully healed within days.

17

The court now applies the test and measure of deference set forth in Whitley. The need for physical force was created by defendant's own failure to abide by prison rules and subsequent refusal to obey a command from a prison official. Considering the physical attributes and disruptiveness of plaintiff and his refusal to be shepherded back into his cell, it was reasonable for Officer Ambrose to conclude that plaintiff would only respond to an increased application of physical force. The force applied by Officers Ambrose and Ellis was applied in a good faith effort to restore discipline. Insubordination to both prison rules and official commands creates a substantial danger for both inmates and prison officials. Although plaintiff suffered injuries in his scuffle with Officers Ambrose and Ellis, such injuries were not the result of a malicious and sadistic application of force and not so repugnant as to warrant a constitutional violation.

D. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether a public official is entitled to qualified immunity, the court must examine: (1) whether the facts alleged

18

make out a violation of a constitutional right; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The court may look to either aspect of the test first when determining the issue of qualified immunity. Id. at 236.

Although this court does not find the existence of a constitutional violation in this case, the officers would be entitled to qualified immunity.

## E. Defendant Craig Friedman

The record fails to demonstrate any direct causal link between Mr. Friedman and the alleged harm. In fact, plaintiff's complaint is devoid of any allegations against Mr. Friedman. Additionally, because no underlying constitutional violation was found, Mr. Friedman cannot be held responsible under any supervisory liability claim. Therefore, any such claim fails.

## F. Plaintiff's Motion to Appoint Counsel

No right to counsel exists in civil cases absent "exceptional circumstances." Whisenaut v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated in part on other grounds by Mallard v. U.S. Dist. Court, 490 U.S. 296 (1989). The existence of exceptional circumstances "hinges on [the] characteristics of the claim and the litigant." Whisenaut, 739 F.2d at 163. As

19

this case does not present exceptional circumstances, plaintiff's motion to appoint counsel [D.E. #22] is DENIED.

## G. Plaintiff's Motion to Amend Complaint and Leave to File

Plaintiff's motion for leave to file an amended complaint [D.E. #20] is GRANTED, and plaintiff's amended complaint [D.E. #19] is ACCEPTED.[6]

## H. Plaintiff's Motion for Leave to File *In Forma Pauperis*

Plaintiff's motion for leave to file in forma pauperis [D.E. #21] is DENIED. The court previously issued an order [D.E. #5] allowing plaintiff to proceed without prepayment of fees and establishing a payment plan in accordance with 28 U.S.C. § 1915, which requires all incarcerated plaintiffs who initiate civil actions to pay the full filing fee.

## I. Plaintiff's Motion and Request for Subpoena Evidence

Plaintiff's motion and request for subpoena evidence [D.E. #23] is DISMISSED AS MOOT because defendants served timely responses to plaintiff's request pursuant to Rule 34 of the Federal Rules of Civil Procedure.

## CONCLUSION

For the foregoing reasons and reasons more fully set forth in defendants' memorandum in support of their motion, defendants' motion for summary judgment [D.E. #34] is GRANTED. Plaintiff's motions for leave to file amended complaint [D.E.

---

[6] Although D.E. #19 is styled "Motion to Amend Complaint" on the docket sheet, this court construes D.E. #19 as plaintiff's amended complaint.

#20] and amended complaint [D.E. #19] are hereby GRANTED. Plaintiff's motions for leave to file in forma pauperis [D.E. #21] and appointment of counsel [D.E. #22] are DENIED. Plaintiff's motion and request for subpoena evidence [D.E. #23] is DISMISSED AS MOOT. The clerk is directed to close this case.

This 18th day of March 2015.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#34